FILED

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA   2009 MAR 24  P 1: 05
ALEXANDRIA DIVISION

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| PROMONTORY INTERFINANCIAL NETWORK, LLC<br>1515 N. Courthouse Road, Suite 800<br>Arlington, Virginia 22201<br><br>Plaintiff,<br><br>v.<br><br>DOUBLE ROCK CORPORATION, p/k/a<br>RESERVE MANAGEMENT CORPORATION<br>1250 Broadway<br>New York, New York 10001<br><br>and<br><br>ISLAND INTELLECTUAL PROPERTY LLC<br>1250 Broadway<br>New York, New York 10001<br><br>Defendants. | Civil Action No. 1:09 cv 316<br>LO | TRS<br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Promontory Interfinancial Network, LLC ("Promontory") brings this action

seeking declaratory and injunctive relief and damages against Defendant Double Rock

Corporation p/k/a Reserve Management Corporation ("the Reserve") and Island Intellectual

Property LLC ("Island IP", collectively with the Reserve, "the Reserve Parties"). The Reserve

Parties have threatened to assert against Promontory, and its customers, patents that the Reserve

Parties obtained through inequitable conduct, that are invalid, and that Promontory does not

infringe. To address the harms resulting from the Reserve Parties' unlawful conduct,

Promontory alleges for its complaint as follows:

### NATURE OF ACTION

1.     Promontory and the Reserve have competed in the market for providing "deposit

sweep services" to broker-dealers. In a deposit sweep service, cash held in customer accounts at

broker-dealers is transferred electronically ("swept") into federally-insured and interest-bearing

deposit accounts until the cash is needed by the customer. Financial institutions have offered

such services to their customers since at least the early 1980s. Nonetheless, more than ten years

later in the late 1990s, the Reserve began filing United States patent applications purporting to

claim methods and systems for providing deposit sweep services that are indistinguishable from

these earlier services. The methods and systems claimed by the Reserve were well-known when

it filed its applications: the "invention" the Reserve sought to patent involves nothing more than

the application of longstanding legal principles found in banking statutes, regulations, and court

decisions.

2.     Knowing that deposit sweep services offered years before would likely prevent it

from obtaining any issued patents, during the prosecution of its patent applications the Reserve,

and more recently, Island IP, concealed from and misrepresented to the United States Patent and

Trademark Office ("PTO") material information about these earlier services. The Reserve also

concealed from and misrepresented to the PTO material information about the Reserve's own

deposit sweep service -- including that it was offered for sale more than one year prior to the first

Reserve patent application. As a result of these concealments and misrepresentations, two of the

applications filed by the Reserve Parties have now issued as United States Patents Nos.

6,374,231 ("the '231 patent") and 7,509,286 ("the '286 patent") (collectively, "the Reserve

2

Patents"). The Reserve assigned its rights to the Reserve Patents and related patent applications to Island IP, a wholly owned subsidiary of the Reserve, in December 2008.

3.      Promontory offers its customers a deposit sweep service that works in a fundamentally different way than the Reserve's deposit sweep service and the methods and systems that are the subject of the Reserve Patents and related patent applications. The Reserve Parties know or should know that Promontory's service is not covered by these patents and applications and that the Reserve Patents and related patent applications are invalid and unenforceable. Yet the Reserve has falsely stated to Promontory's customers and service providers that Promontory's deposit sweep service practices the Reserve Patents and related applications and that Promontory's customers and service providers may incur liability for patent infringement. This improper and malicious conduct by the Reserve has harmed Promontory's business and reputation and has caused Promontory to lose substantial potential revenue.

4.      Accordingly, a substantial, immediate, and real controversy exists between Promontory and the Reserve Parties that can be fully resolved in this action, and therefore, Promontory brings claims under federal law to declare the Reserve Patents invalid, unenforceable, and not infringed, and under federal and state law to address the Reserve's unfair competition and its false statements to Promontory's customers and service providers. Promontory seeks declaratory and injunctive relief, compensatory damages, punitive damages, attorney's fees, and costs.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Promontory's declaratory judgment claims (Counts I – VI) pursuant to 28 U.S.C. §§ 1331 and 1338(a), because they present a federal question arising under Title 35 of the United States Code, and pursuant to 28

U.S.C. §§ 2201 and 2202, because an actual controversy exists as to the invalidity, unenforceability, and infringement of the Reserve Patents. This Court has subject matter jurisdiction over Promontory's state law claims (Counts VII – VIII) pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs, and supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a). This Court has subject matter jurisdiction over Promontory's unfair competition claim arising under the Lanham Act, 15 U.S.C. § 1125(a) (Count IX) pursuant to 28 U.S.C. § 1331. This Court also has subject matter jurisdiction over Promontory's state and federal law unfair competition claims (Counts VIII and IX) pursuant to 28 U.S.C. § 1338(b), because they are joined with substantial and related claims under the patent laws.

6.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), because the Reserve Parties reside in this judicial district and because a substantial part of the events or omissions giving rise to Promontory's claims occurred in this judicial district.

7.     This Court has personal jurisdiction over the Reserve parties, because, upon information and belief: (i) the Reserve Parties have contracted to supply services or things in this Commonwealth; (ii) the Reserve Parties have caused tortious injury in this Commonwealth by an act or omission outside this Commonwealth; and (iii) the Reserve Parties regularly does or solicits business, and engages in other persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

## PARTIES

8.     Plaintiff Promontory Interfinancial Network, LLC is a Delaware limited liability company with its principal place of business at 1515 N. Courthouse Road, Arlington, Virginia 22201. Promontory was founded in 2002 by banking-industry leaders, including a former Comptroller of the Currency, Vice Chairman of the Federal Reserve Board, and Chief of Staff of

the Federal Deposit Insurance Corporation ("FDIC"). Promontory provides services to the financial services industry, including, among other things, deposit sweep services for broker-dealers.

9.      Upon information and belief, Defendant Double Rock Corporation, which was previously known as Reserve Management Corporation, is a New Jersey corporation with its principal place of business at 1250 Broadway, New York, New York 10001. The Reserve is a direct competitor of Promontory in the market for deposit sweep services.

10.     Upon information and belief, Defendant Island Intellectual Property LLC, which is a wholly-owned, patent-holding subsidiary of Double Rock Corporation, is a New Jersey corporation with its principal place of business at 1250 Broadway, New York, New York 10001. The Reserve assigned all rights to the Reserve Patents and related patent applications to Island IP on December 4, 2008. Upon information and belief, throughout the existence of Island IP, Defendant Island IP has been controlled by the Reserve, and Defendants Island IP and the Reserve have acted through the same agents and been represented by the same counsel.

## FACTUAL BACKGROUND

### Deposit Sweep Services

11.     Broker-dealer customers commonly hold uninvested or "excess" cash in their brokerage accounts. The excess cash held in a brokerage account may result from interest or dividend payments on securities, the sale of securities, or a deposit of cash by the customer. Under SEC regulations, a broker-dealer is not required to pay interest on such excess cash.

12.     As a service to their customers, many broker-dealers will automatically invest, or "sweep," the excess cash in a customer's brokerage account into a liquid investment, such as a money market mutual fund or a bank deposit account. Broker-dealers may also offer cash management features on the brokerage account, allowing the customer to write checks, make

5

debit card transactions, and make ATM withdrawals against the cash in the brokerage account. When a customer uses the cash management feature to make such a transaction, the broker-dealer withdraws funds from the money market fund or deposit account to satisfy the debits incurred by the customer.

13.     Many broker-dealers that provide sweeps of excess cash offer their customers the option to sweep cash into a deposit account at a bank whose accounts are insured by the Federal Deposit Insurance Corporation ("FDIC") (hereinafter, "a deposit sweep arrangement"). In a typical deposit sweep arrangement, such as those supported by Promontory on each business day the broker-dealer sweeps excess cash from the brokerage accounts into the deposit accounts and transfers funds back into the brokerage accounts that are necessary to satisfy any withdrawals or transactions by the broker-dealer's customers (*e.g.*, check or debit card transactions).

14.     In many deposit sweep arrangements, including those supported by Promontory, the cash swept from the brokerage accounts is primarily held in money market deposit accounts ("MMDAs"), a type of savings account, at one or more banks. Federal banking laws and regulations do not require banks to hold cash reserves against MMDAs so long as depositors are prohibited from making more than six transfers or withdrawals in a month, no more than three of which may be withdrawals by check or debit card, subject to certain exceptions.

15.     A deposit sweep arrangement allows a broker-dealer customer to earn interest and obtain FDIC insurance on cash that is not immediately needed and that, if kept in the brokerage account, may not generate interest or obtain FDIC insurance. By using properly designed deposit sweep arrangements, customers can make unlimited transactions, including check and debit card transactions, from their brokerage accounts, while earning interest and/or obtaining FDIC insurance.

16.     Some broker-dealers sweep customer funds into MMDAs at multiple banks. This permits the broker-dealer to offer customers FDIC insurance on their deposits in excess of the limit imposed upon a single depositor at a single bank, which is presently $250,000.

17.     Broker-dealers benefit from deposit sweep arrangements because the broker-dealers are typically paid a fee based on a percentage of the deposits placed with the bank.

18.     A deposit sweep arrangement also benefits banks that hold swept funds because the arrangement provides such banks with a relatively large, long-term, and stable source of deposits. Further, by complying with the limits on the number of withdrawals or transfers that can be made in a month from an MMDA, such banks generally are not required to hold cash reserves on the swept funds while they are held in an MMDA.

19.     Service providers such as Promontory enter into agreements with broker-dealers to provide processing services in connection with a deposit sweep arrangement, and with banks to accept swept funds into deposit accounts. These service providers, including Promontory, typically receive a fee from the banks for their services.

20.     Upon information and belief, the first deposit sweep service was developed and offered by Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"). As a broker-dealer, Merrill Lynch offered this service to its brokerage customers at least as early as 1983 as a feature of Merrill Lynch's Cash Management Account ("CMA"), a brokerage account with cash management features. Merrill Lynch called this feature the Insured Savings Account ("ISA") (collectively, "Original 1983 CMA/ISA Service").

21.     Since Merrill Lynch introduced the Original 1983 CMA/ISA Service, many broker-dealers and banks have offered similar deposit sweep services to their customers.

22.    Upon information and belief, at least as early 1998, Merrill Lynch began developing a second deposit sweep service.  Merrill Lynch offered this second service to its brokerage customers at least as early as 2000 under the name Cash Management Account 2.0 ("2000 CMA 2.0 Service").

### Regulatory Background

23.    The structure and operation of a deposit sweep service must comply with various banking statutes and regulations, as well as guidance from relevant federal agencies.

24.    Under a regulation promulgated by the Federal Reserve Board in 1980, an MMDA depositor "is permitted or authorized to make no more than six transfers and withdrawals, or a combination of such transfers and withdrawals, per calendar month or statement cycle (or similar period) of at least four weeks, to another account (including a transaction account) of the depositor at the same institution or to a third party by means of a preauthorized or automatic transfer, or telephonic (including data transmission) agreement, order or instruction, and no more than three of the six such transfers may be made by check, draft, debit card, or similar order made by the depositor and payable to third parties." 12 C.F.R. § 204.2(d)(2) (hereinafter, "Regulation D").

25.    Regulation D contains an exception to this general monthly limit for any "transfers or withdrawals [that] are made by mail, messenger, automated teller machine, or in person or when such withdrawals are made by telephone (via check mailed to the depositor) regardless of the number of such transfers or withdrawals."

26.    The Federal Reserve Board has provided guidance on whether certain deposit sweep services comply with Regulation D.  In an interpretive letter dated June 22, 1983, the Federal Reserve Board concluded that, under Regulation D, a broker-dealer cannot establish MMDAs, in its own name, and utilize a messenger to make withdrawals from the MMDAs on

behalf of the broker-dealer's customers, in order to offer those customers unlimited checking or debit card transactions.  In a letter dated June 22, 1988, the Federal Reserve Board reaffirmed that these types of deposit sweep services violate Regulation D ("Federal Reserve Board Letter").

### The Parties' Competing Deposit Sweep Services

27.     Promontory began providing processing services to broker-dealers to support deposit sweep arrangements in 2006.  Promontory offers such services under the service marks Insured Network Deposits, IND®, and IND2 (hereinafter, all versions collectively referred to as "IND")

28.     Promontory has carefully designed IND to comply with applicable laws, regulations and regulatory guidance, and Promontory promotes and markets the service by reference to such compliance.  IND does not make withdrawals or transfers from MMDAs established through IND using any of the five methods that allow for unlimited monthly withdrawals or transfers from an MMDA under Regulation D.

29.     At present, IND supports numerous broker-dealers in sweeping cash from nearly two million brokerage accounts into deposit accounts at over 70 different banks throughout the country.  These deposit accounts contain an aggregate of approximately $18 billion in customer funds.  By supporting the sweeping of funds into multiple banks, the IND service permits broker-dealers to offer each of their eligible customers access to as much as $1 million or more in FDIC insurance.

30.     The Reserve has offered a service to broker-dealers under the service mark Reserve Insured Deposits®.  Upon information and belief, the Reserve began offering this service to the public as early as 1997.  The Reserve Insured Deposits service directly has competed with Promontory's IND service.

31.     Upon information and belief, the Reserve has assisted broker-dealers in establishing MMDAs at banking institutions to hold funds swept from brokerage accounts through the Reserve Insured Deposits service. Upon information and belief, at all relevant times, and in violation of Regulation D, the Reserve has employed messengers to withdraw or transfer funds from the MMDAs and to provide broker-dealer customers with unlimited withdrawals from their brokerage account, including withdrawals by check or debit card.

### The Reserve Patents and Related Applications

32.     In late 1998, the Reserve began to file United States patent applications relating to certain aspects of deposit sweep services.

33.     On or about October 21, 1998, the Reserve filed U.S. Patent Application No. 09/176,340. This application issued as the '231 patent on or about April 16, 2002. The Reserve had alleged that it owned the '231 patent until the transfer of all its rights to the '231 patent to its wholly-owned subsidiary, Island IP, in December 2008. Island IP has alleged that it owns the '231 patent.

34.     Upon information and belief, on or about April 11, 2003, the Reserve filed U.S. Patent Application No. 10/411,650 ("the '650 application") as a continuation-in-part of the '231 patent. The '650 application was unpublished by the PTO. The Reserve had alleged that it owned the '650 application until the transfer of all its rights to the '650 patent application to its wholly-owned subsidiary, Island IP, in December 2008.

35.     The '650 application issued as the '286 patent on or about March 24, 2009. Upon information and belief, Island IP alleges that it owns the '286 patent.

36.     Upon information and belief, the Reserve has filed several other U.S. patent applications that are related to the Reserve Patents, including U.S. Patent Applications Nos. 09/677,535; 10/071,053; 10/305,439; 10/382,946; 10/825,440; 11/149,278; 11/641,046;

11/689,247; 11/767,827; 11/767,837; 11/767,846; 11/767,856; 11/840,052; 11/840,060; 11/840,064; 11/932,762; 12/025,402; 12/271,705 and 12/340,026 (collectively, "the Related Applications").

37.     The alleged "invention" of the Reserve Patents and the Related Applications that have been published is the attempt to employ a deposit sweep service that purports to avoid the provision in Regulation D imposing a monthly limit on certain types of transfers that an individual can make from MMDAs and other savings deposits. The alleged "invention" of the '286 patent also concerns the use, in a deposit sweep service, of the well-established legal principle that a depositor may obtain FDIC insurance above the limit imposed upon a single depositor at a single institution by placing funds in more than one insured account. Accordingly, the Reserve Patents and Related Applications do not disclose and claim inventions.

38.     The claimed methods and systems of the Reserve Patents and Related Applications are limited to making withdrawals and transfers from MMDAs and other insured deposit accounts to transaction accounts using one of the five specific methods identified in Regulation D -- namely, by mail, messenger, automated teller machine, by telephone (via check mailed to the depositor), or in person.

39.     The Reserve Patents and Related Applications require the use of one of these five methods for making withdrawals and transfers from insured deposit accounts in an attempt to provide transaction accounts (e.g., brokerage accounts) that are not subject to Regulation D's limits on the number of withdrawals or transfers that a customer may make from an MMDA in a month. Because the Federal Reserve Board has determined that this arrangement does not comply with Regulation D, practicing the claimed methods and systems of the Reserve Patents

and Related Applications violates applicable banking laws and regulations, including Regulation D.

### The Reserve Parties' Failure to Disclose Information About Prior Deposit Sweep Services to the PTO

40.     Upon information and belief, when the Reserve filed its patent applications with the PTO, the Reserve knew about deposit sweep services offered and used years ago by other financial institutions that were the same or similar in material respects to the claimed methods and systems of the Reserve's patent applications. These services include, without limitation, Merrill Lynch's Original 1983 CMA/ISA Service and 2000 CMA 2.0 Service. In addition, upon information and belief, when the Reserve filed its patent applications with the PTO, the Reserve knew about printed publications describing methods and systems for deposit sweep services that were published more than one year before the Reserve filed any of its patent applications

41.     Upon information and belief, during the prosecution of its patent applications before the PTO, the Reserve Parties failed to disclose or misrepresented information about these services, and the Reserve Parties failed to disclose, or made misrepresentations about, the printed publications describing deposit sweep services.

42.     In addition, when the Reserve filed its patent applications, it knew about its own Reserve Insured Deposits service, which it has asserted is covered by the claims of one or more of the Reserve Patents and Related Applications. Upon information and belief, the Reserve sold, offered for sale, or publicly used one or more versions of the Reserve Insured Deposits service more than one year before the filing dates of each of its patent applications.

43.     The Reserve failed to disclose to the PTO material information about the Reserve Insured Deposits service during the prosecution of the application that led to the '231 patent.

Upon information and belief, the Reserve Parties also failed to disclose to the PTO, for several years during the pendency of the application that led to the '286 patent, material information about the Reserve Insured Deposits service. The Reserve eventually disclosed information about the Reserve Insured Deposits service in connection with this application, but only after it received letters from Promontory reminding the Reserve of its obligation to disclose such information, and even then its disclosure was inadequate and misleading. Furthermore, while the Reserve belatedly disclosed information about the Reserve Insured Deposits service to the PTO, it denied selling, offering for sale, publicly using, and advertising the Reserve Insured Deposits service before October 21, 1997, when in fact a magazine publicly distributed in September 1997 contained an advertisement for the Reserve Insured Deposits service. After Promontory brought this to the Reserve's attention, the Reserve was forced to amend its pending patent applications.

44. More recently, the Reserve Parties continued the practice of failing to properly disclose prior art, and providing misleading statements to the PTO in the prosecution of the Reserve Patents and Related Applications. Promontory notified the Reserve Parties, in a letter dated February 23, 2009, that the Reserve had failed to disclose to the PTO relevant prior art in the form of the Merrill Lynch Banking Advantage program ("the MLBA program"). In response, the Reserve Parties submitted a certification made by the Reserve Parties' patent attorney in the March 3, 2009, Information Disclosure Statement ("IDS") in U.S. Patent Application No. 10/071,053, in which the Reserve Parties disclosed two publications about the MLBA program. The certification continued that "to the knowledge of the undersigned, after making reasonable inquiry, no item of information contained in the [IDS] was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of the [IDS]." Upon information and belief, it appears that Bruce Bent II, one of the named inventors of

the Reserve Patents and Related Applications, was aware of the MLBA program long before the filing of the IDS, as evidenced by his comments about the program in a November 1, 2000 article in *On Wall Street*.

### The Reserve Parties' Assertion of Its Alleged Patent Rights Against Promontory

45.     Since at least 2006, the Reserve has falsely asserted that Promontory's IND service practices one or more of the Reserve Patents and Related Applications.

46.     The Reserve sent a letter dated May 24, 2006, to Promontory regarding the '231 patent, the application that led to the '286 patent, and some of the Related Applications.  The letter stated that its purpose is "to advise [Promontory] of certain intellectual property rights owned by the Reserve which may be of interest to Promontory in connection with its Promontory Deposit Sweep Service or other FDIC insured money market account processing services."  The letter further stated that "[t]he Reserve would be willing to license, on reasonable and competitive rates, its rights in the '231 Patent," the application that led to the '286 patent, certain other applications, and "the remainder of its patent portfolio."

47.     Promontory responded to the Reserve's May 24, 2006, letter in a letter dated June 30, 2006.  In this letter, Promontory stated, among other things, that it "does not practice The Reserve's claimed invention and does not wish to do so."  Nevertheless, Promontory noted that "[i]f [the Reserve] believes that Promontory for some reason is required to be licensed, [Promontory] would appreciate receiving a detailed explanation of the basis for its belief."

48.     The Reserve's responsive letter dated July 12, 2006, stated that "Promontory's exposure to the published claims of the pending applications has already commenced to the extent it practices such claims and claims commensurate in scope ultimately issue from the U.S. Patent and Trademark Office, as we believe will occur."

49.     In a responsive letter dated July 18, 2006, Promontory reaffirmed that "it has no interest in [the Reserve's deposit sweep] methods or systems."

50.     In a letter dated March 2, 2007, the Reserve referred to publications of the application that led to the '286 patent and another application, and the Reserve asserted that Promontory practices the claims of these applications. The letter stated, "We continue to expect that claims commensurate in scope with the claims included in these published applications as well as the prior published applications identified in our earlier correspondence will be issuing in the near future. We believe that [Promontory] should reconsider its current conduct and the irreparable harm such conduct is causing The Reserve through, among other things, the price erosion caused by [Promontory's] pricing practices and [Promontory's] sale of competitive products coming within the scope of these claims."

51.     Promontory responded to the Reserve's March 2, 2007, letter in a letter dated May 1, 2007. In this letter, Promontory urged the Reserve to "proceed with caution with these allegations, as any reasonable investigation will lead to the conclusion that there is no good faith basis for asserting that Promontory's conduct falls within the scope of any valid and enforceable claim." Promontory also observed in this letter that "every claim of The Reserve's pending applications that the PTO has examined currently stands rejected."

52.     Most recently, in a letter to Promontory's counsel dated March 10, 2009, the Reserve Parties reiterated their allegation that Promontory was wrongly using the purported inventions claimed in the '231 patent, the application for the '286 patent, as well as the pending Related Applications, reciting

> [Y]our June 30, 2006 letter which categorically denied Promontory's use of the claimed invention and incorrectly asserted that the '231 Patent and the pending patent applications "circumvent, if not violate, federal regulatory requirements." Your client, or at least its banking counsel, should have realized that both of these assertions were untrue. [...]

15

> Since that time, your client's willful misappropriation of Double Rock's inventions to
> compete with Double Rock has resulted in substantial harm to Double Rock, including the
> loss of several clients, and has eroded Double Rock 's profits on the products it has
> been able to sell.

53.     The Reserve Parties have never provided Promontory with any explanation of its

assertion that Promontory's IND service practices the Reserve Patents and Related Applications.

54.     The Reserve's assertions were and are objectively baseless because no reasonable

litigant could expect to succeed on a claim that IND infringes any of the Reserve Patents and

Applications for at least the following reasons: (a) the IND service does not make withdrawals

or transfers from MMDAs using one of the five methods identified in Regulation D, which are

required to be used by the Reserve Patents and Related Applications; (b) the Reserve Patents and

Related Applications are invalid in light of the Reserve Parties' own deposit sweep service, the

prior deposit sweep services of other financial institutions, the printed publications identified

herein, and other prior art; (c) the Reserve Patents and Related Applications are invalid under 35

U.S.C. §§ 101 and 112 because the claimed methods and systems are illegal under the banking

laws and regulations; and (d) the Reserve Patents and Related Applications are unenforceable

due to inequitable conduct, described more fully below.

### The Reserve's Interference with Promontory's Business Relationships

55.     Since at least 2006, the Reserve has interfered with Promontory's actual and

potential business relationships relating to IND. Among other things, the Reserve has made false

assertions to Promontory's actual and prospective customers and service providers that IND

practices one or more of the Reserve Patents and Applications.

56.     For example, the Reserve has communicated with Linsco/Private Ledger

Corporation ("LPL"), Dreyfus Corporation ("Dreyfus"), Oppenheimer & Co., Inc.

("Oppenheimer"), Reich & Tang Asset Management, LLC ("Reich & Tang"), and A.G. Edwards

& Sons, Inc. ("A.G. Edwards"). Upon information and belief, at the time the Reserve made each such communication, the Reserve knew or should have known the third party was an actual or prospective customer of Promontory's IND service and/or had a business relationship with Promontory relating to IND.

57.    In the Reserve's communications, it has identified some or all of the Reserve Patents and Related Applications, and has asserted or suggested that Promontory's IND service, the use thereof, or the provision of services in relation thereto, practices one or more of the Reserve Patents and Related Applications. The Reserve has further stated to some of these third parties that liability for patent infringement on the part of the third party may have already commenced. Some of the communications have invited the recipient to commence a business relationship with the Reserve for the provision of deposit sweep services.

58.    These false and misleading statements to Promontory's customers and service providers have harmed Promontory by, among other things, causing it to lose A.G. Edwards' deposit sweep business, incur expenses to repair these business relationships, consummate business transactions, correct misimpressions caused by the false statements, and restore the goodwill associated with its IND service.

**CAUSES OF ACTION**

**COUNT I**

**Declaratory Judgment of Non-Infringement of the '231 Patent**

59.    The allegations contained in paragraphs numbered 1 through 58 are incorporated by reference herein with the same force and effect as if set forth in full below.

60.    Promontory does not infringe, directly or indirectly, any claim of the '231 patent.

61.     An actual and justiciable controversy exists between Promontory and the Reserve Parties as to whether Promontory infringes any claim of the '231 patent. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

62.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that it does not infringe any claim of the '231 patent, and any other relief that the Court deems necessary or proper.

63.     This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT II

### Declaratory Judgment of Invalidity of the '231 Patent

64.     The allegations contained in paragraphs numbered 1 through 63 are incorporated by reference herein with the same force and effect as if set forth in full below.

65.     Each and every claim of the '231 patent is invalid under one or more of the provisions of Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112, 116, and 135.

66.     An actual and justiciable controversy exists between Promontory and the Reserve Parties as to whether each and every claim of the '231 patent is invalid. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

67.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that each and every claim of the '231 patent is invalid, and any other relief that the Court deems necessary or proper.

68.     This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT III

### Declaratory Judgment of Unenforceability of the '231 Patent

69.     The allegations contained in paragraphs numbered 1 through 68 are incorporated by reference herein with the same force and effect as if set forth in full below.

70.     The '231 patent is unenforceable because one or more persons involved in the prosecution of the application that led to the '231 patent or applications related to the '231 patent committed inequitable conduct. Upon information and belief, with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties breached the duty of candor, good faith, and honesty in prosecuting these applications by submitting false or misleading information, misrepresenting information, or failing to disclose information material to the patentability of the claimed inventions.

71.     Upon information and belief, during the prosecution of the application that led to the '231 patent, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve submitted misrepresented or failed to disclose to the PTO material information about the Reserve Insured Deposits service. Upon information and belief, the Reserve Insured Deposits service was on sale and/or in public use more than one year prior to the date of the application that resulted in the '231 patent, or the Reserve Insured Deposits service otherwise constitutes prior art with respect to the '231 patent under 35 U.S.C. § 102. The Reserve has asserted that its Reserve Insured Deposits service embodies one or more claims of the '231 patent, and, for at least this reason, information about the service was material to the patentability of one or more of the claims of the application. Upon information and belief, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve misrepresented or failed to disclose material information about the Reserve Insured Deposits service with the intent to deceive the PTO. This constitutes inequitable conduct and renders the '231 patent unenforceable.

72.    Upon information and belief, during the prosecution of the application that led to the '231 patent, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve misrepresented or failed to disclose material information to the PTO about the Original 1983 CMA/ISA Service. The Original 1983 CMA/ISA Service was on sale and/or in public use more than one year prior to the date of the application that resulted in the '231 patent, and information about the service was material to the patentability of one or more of the claims of the application. Upon information and belief, with the intent to deceive the PTO, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve were aware of material information about the Original 1983 CMA/ISA Service during the prosecution of the application that resulted in the '231 patent and misrepresented or failed to disclose material information about the Original 1983 CMA/ISA Service. This constitutes inequitable conduct and renders the '231 patent unenforceable.

73.    Upon information and belief, during the prosecution of the application that led to the '231 patent, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve failed to disclose certain printed publications describing deposit sweep services, including without limitation: a letter from William W. Wiles, Secretary of the Federal Reserve Board, dated June 22, 1983; a letter from Michael Bradfield, General Counsel of the Federal Reserve Board, dated November 16, 1984; and letters from Oliver I. Ireland, Associate General Counsel of the Federal Reserve Board, dated June 22, 1988, February 7, 1995, August 1, 1995, August 30, 1995, and October 18, 1996. Each of these printed publications was material to the patentability of one or more of the claims of the application that resulted in the '231 patent. Upon information and belief, with the intent to deceive the PTO, the Reserve, the named inventors, or attorneys, agents or representatives of the Reserve were aware of each of these

printed publications during the prosecution of the application and failed to disclose the publications. This constitutes inequitable conduct and renders the '231 patent unenforceable.

74. An actual and justiciable controversy exists between Promontory and the Reserve Parties as to whether the '231 patent is unenforceable. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

75. Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that the '231 patent is unenforceable, and any other relief that the Court deems necessary or proper.

76. This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT IV

### Declaratory Judgment of Non-Infringement of the '286 Patent

77. The allegations contained in paragraphs numbered 1 through 76 are incorporated by reference herein with the same force and effect as if set forth in full below.

78. Promontory does not infringe, directly or indirectly, any claim of the '286 patent.

79. An actual and justiciable controversy exists between Promontory and the Reserve as to whether Promontory infringes any claim of the '286 patent. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

80. Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that it does not infringe any claim of the '286 patent, and any other relief that the Court deems necessary or proper.

81. This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT V

### Declaratory Judgment of Invalidity of the '286 Patent

82.     The allegations contained in paragraphs numbered 1 through 81 are incorporated by reference herein with the same force and effect as if set forth in full below.

83.     Each and every claim of the '286 patent is invalid under one or more of the provisions of Title 35 of the United States Code, including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, 112, 116, and 135.

84.     An actual and justiciable controversy exists between Promontory and the Reserve as to whether each and every claim of the '286 patent is invalid. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

85.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that each and every claim of the '286 patent is invalid, and any other relief that the Court deems necessary or proper.

86.     This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT VI

### Declaratory Judgment of Unenforceability of the '286 Patent

87.     The allegations contained in paragraphs numbered 1 through 86 are incorporated by reference herein with the same force and effect as if set forth in full below.

88.     The '286 patent is unenforceable because one or more persons involved in the prosecution of the application that led to the '286 patent or applications related to the '286 patent committed inequitable conduct. Upon information and belief, with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties breached the duty of candor, good faith, and honesty in prosecuting these

22

applications by submitting false or misleading information, misrepresenting information, or failing to disclose information material to the patentability of the claimed inventions.

89.     Upon information and belief, during the prosecution of the application that led to the '286 patent, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties submitted misrepresented or failed to disclose to the PTO material information about the Original 1983 CMA/ISA Service. The Original 1983 CMA/ISA Service was on sale and/or in public use more than one year prior to the date of application of the '286 patent, and information about the Original 1983 CMA/ISA Service was material to the patentability of one or more of the claims of the application that resulted in the '286 patent. Upon information and belief, during the prosecution of the application that led to the '286 patent, with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties were aware of material information about the Original 1983 CMA/ISA Service and misrepresented or failed to disclose material information about the Original 1983 CMA/ISA Service. This constitutes inequitable conduct and renders the '286 patent unenforceable.

90.     Upon information and belief, during the prosecution of the application that led to the '286 patent, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties misrepresented or failed to disclose to the PTO material information about the 2000 CMA 2.0 Service. The 2000 CMA 2.0 Service was on sale and/or in public use, and described in printed publications, before the alleged invention of the '286 patent or otherwise constitutes prior art under 35 U.S.C. § 102, and information about the service was material to the patentability of one or more of the claims of the application that resulted in the '286 patent. Upon information and belief, during the prosecution of the application that led to the '286 patent,

with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties were aware of material information about the 2000 CMA 2.0 Service and misrepresented or failed to disclose material information about the 2000 CMA 2.0 Service. This constitutes inequitable conduct and renders the '286 patent unenforceable.

91.    Upon information and belief, during the prosecution of the application that led to the '286 patent, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties misrepresented or failed to disclose to the PTO material information about the MLBA program. The MBLA program was on sale and/or in public use, and described in printed publications, before the alleged invention of the '286 patent or otherwise constitutes prior art under 35 U.S.C. § 102, and information about the service was material to the patentability of one or more of the claims of the application that resulted in the '286 patent. Upon information and belief, during the prosecution of the application that led to the '286 patent, with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties were aware of material information about the MLBA program and misrepresented or failed to disclose material information about the MLBA program. This constitutes inequitable conduct and renders the '286 patent unenforceable.

92.    Upon information and belief, during the prosecution of the application that led to the '286 patent, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties failed to disclose, or made misrepresentations about, certain printed publications describing deposit sweep services, including without limitation: a letter from William W. Wiles, Secretary of the Federal Reserve Board, dated June 22, 1983; a letter from Michael Bradfield, General Counsel of the Federal Reserve Board, dated November 16, 1984;

and letters from Oliver I. Ireland, Associate General Counsel of the Federal Reserve Board, dated June 22, 1988, February 7, 1995, August 1, 1995, August 30, 1995, and October 18, 1996. Each of these printed publications was material to the patentability of one or more of the claims of the application that resulted in the '286 patent. Upon information and belief, during the prosecution of the application that led to the '286 patent, with the intent to deceive the PTO, the Reserve Parties, the named inventors, or attorneys, agents or representatives of the Reserve Parties were aware of each of these printed publications and failed to disclose, or made misrepresentations about, the publications. This constitutes inequitable conduct and renders the '286 patent unenforceable.

93.     The inequitable conduct committed in connection with the prosecution of the '231 patent also renders the '286 patent unenforceable, because this inequitable conduct relates to the claims of the '286 patent.

94.     An actual and justiciable controversy exists between Promontory and the Reserve Parties as to whether each and every claim of the '286 patent is unenforceable. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

95.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Promontory is entitled to a declaratory judgment that each and every claim of the '286 patent is unenforceable, and any other relief that the Court deems necessary or proper.

96.     This is an exceptional case under 35 U.S.C. § 285, entitling Promontory to an award of its attorneys' fees incurred in connection with this action.

## COUNT VII

### Tortious Interference with Business Relations

97.     The allegations contained in paragraphs numbered 1 through 96 are incorporated by reference herein with the same force and effect as if set forth in full below.

98.     The Reserve has provided deposit sweep services that competed with Promontory's IND service.

99.     Promontory has and has had valid present and prospective business relationships or expectancies with third parties relating to the IND service ("IND Third Parties"), including, without limitation, LPL, Drefyus, Oppenheimer, Reich & Tang, and A.G. Edwards.  These business relationships or expectancies bore or bear a probability of future economic benefit to Promontory.

100.    The Reserve knew and continues to know of the existence of Promontory's business relationships and expectancies.

101.    Despite this knowledge, the Reserve has falsely and misleadingly asserted to IND Third Parties that Promontory's IND service practices one or more of the Reserve Patents and Applications.  In addition, the Reserve has falsely and misleadingly asserted to IND Third Parties that they may incur liability for infringement of one or more of these patents, and these applications if and when they issue, by using the IND service or by continuing their business relationships with Promontory.  Upon information and belief, the Reserve made these false assertions with the intent to interfere with Promontory's actual and prospective business relationships and expectancies.

102.    The Reserve's actions were and are without privilege or justification, and the Reserve employed improper methods in its interference, including misrepresentations, deceit, defamation, unfair competition, and baseless assertions of legal rights.  Upon information and belief, the Reserve made the false and misleading assertions described above in bad faith, and the Reserve knew or should have known that such assertions were false and objectively baseless.

103. The Reserve made these false and misleading assertions to A.G. Edwards in 2007 when Promontory and the Reserve were each in discussions with A.G. Edwards to provide services in support of A.G. Edwards' deposit sweep arrangement. At the time the Reserve made these false and misleading assertions to A.G. Edwards, the Reserve knew or should have known that Promontory was in discussions with A.G. Edwards. As a result of the Reserve's false and misleading assertions, A.G. Edwards decided not to use Promontory's services and terminated discussions with Promontory, and A.G. Edwards selected the Reserve to provide such services. But for the Reserve's conduct, A.G. Edwards would not have rejected Promontory to provide such services.

104. As a result of the Reserve's conduct, Promontory's goodwill with the IND Third Parties has been diminished, and the Reserve has attempted, and will continue to attempt, to divert business to the Reserve that would have gone to Promontory. Further, the Reserve's conduct has caused Promontory to lose business, incur expenses to repair business relationships, consummate business transactions, correct misimpressions caused by the false statements, and restore the goodwill associated with the IND service.

105. The foregoing conduct by the Reserve constitutes tortious interference with Promontory's business relationships and expectancies.

106. As a consequence of the foregoing, Promontory has suffered and will continue to suffer irreparable harm and loss. Unless enjoined as requested herein, the Reserve will persist in its wrongful and unlawful activities, and Promontory will be irreparably harmed.

107. In addition, Promontory has been and continues to be damaged by the Reserve's actions, and Promontory seeks judgment against the Reserve in an amount to be determined at trial.

## COUNT VIII

### Unfair Competition under Applicable State Law

108.    The allegations contained in paragraphs numbered 1 through 107 are incorporated by reference herein with the same force and effect as if set forth in full below.

109.    The Reserve has provided deposit sweep services that competed with Promontory's IND service.

110.    The Reserve has falsely and misleadingly asserted in the marketplace for deposit sweep services that the IND service practices one or more of the Reserve Patents and Related Applications.  In addition, the Reserve has falsely and misleadingly asserted to IND customers, users, and service providers that they may incur liability for infringement of one or more of these patents, and these applications if and when they issue, by using the IND service.

111.    Upon information and belief, the Reserve made these false assertions regarding Promontory's IND service in bad faith, and the Reserve knew or should have known that such assertions were false and objectively baseless.  Upon information and belief, the Reserve has made these false assertions for the purposes of causing harm to Promontory's business and misappropriating Promontory's labor, skill, expenditures, and commercial advantages.

112.    Upon information and belief, the Reserve's deposit sweep service violates certain banking laws and regulations, including, without limitation, Regulation D.  The Reserve has violated these laws and regulations in order to misappropriate Promontory's labor, skill, expenditures, and commercial advantages.

113.    As a result of the Reserve's conduct, Promontory has lost business and customers to the Reserve.  In addition, Promontory's goodwill in the marketplace for deposit sweep services has been diminished, and the Reserve has attempted, and will continue to attempt, to divert business to the Reserve that would have gone to Promontory.  Further, the Reserve's

conduct has caused Promontory to incur expenses to repair business relationships, consummate business transactions, correct misimpressions caused by the false statements, and restore the goodwill associated with the IND service.

114.    The foregoing conduct of the Reserve constitutes unfair competition.

115.    As a result of the foregoing, Promontory has suffered and will continue to suffer irreparable harm and loss.  Unless enjoined as requested herein, the Reserve will persist in its wrongful and unlawful activities, and Promontory will thereby continue to be irreparably harmed.

116.    In addition, Promontory has been and continues to be damaged by the Reserve's actions.  Promontory seeks judgment in an amount to be determined at trial for compensatory damages.

## COUNT IX

### Unfair Competition in Violation of Section 43(a) of the Lanham Act

117.    The allegations contained in paragraphs numbered 1 through 116 are incorporated by reference herein with the same force and effect as if set forth in full below.

118.    The Reserve has falsely and misleadingly asserted in the marketplace for deposit sweep services that the IND service practices one or more of the Reserve Patents and Related Applications.  In addition, the Reserve has falsely and misleadingly asserted to IND customers, users, and service providers that they may incur liability for infringement of one or more of these patents, and these applications if and when they issue, by using the IND service.

119.    The Reserve made these false and misleading statements in interstate commerce and in the course of commercial advertising or promotion, and the statements have been sufficiently disseminated in the market for deposit sweep services.

120.    The Reserve's false and misleading statements are material, and have actually deceived or have a tendency to deceive actual and prospective customers of Promontory's IND service.

121.    Upon information and belief, the Reserve made these false and misleading assertions regarding Promontory's IND service in bad faith, and the Reserve knew or should have known that such assertions were false and objectively baseless.

122.    As a result of the Reserve's conduct, Promontory's goodwill in the marketplace for deposit sweep services has been diminished, and the Reserve has attempted, and will continue to attempt, to divert business from Promontory. Further, the Reserve's conduct has caused Promontory to lose business, incur expenses to repair business relationships, consummate business transactions, correct misimpressions caused by the false statements, and restore the goodwill associated with the IND service.

123.    The foregoing conduct constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

124.    As a result of the foregoing, Promontory has suffered and will continue to suffer irreparable harm and loss. Unless enjoined as requested herein, the Reserve will persist in its wrongful and unlawful activities, and Promontory will thereby continue to be irreparably harmed.

125.    In addition, Promontory has been or is likely to be damaged by the Reserve's actions. Promontory seeks judgment in an amount to be determined at trial for compensatory damages, and the award of attorney's fees and costs pursuant to the Lanham Act.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff Promontory Interfinancial Network, LLC respectfully requests that this Court grant the following relief:

a.   Declare that Promontory does not infringe any claim of the '231 patent;

b.   Declare that each and every claim of the '231 patent is invalid;

c.   Declare that each and every claim of the '231 patent is unenforceable;

d.   Declare that Promontory does not infringe any claim of the '286 patent;

e.   Declare that each and every claim of the '286 patent is invalid;

f.   Declare that each and every claim of the '286 patent is unenforceable;

g.   Award Promontory damages in an amount to be determined at trial to compensate it for all losses suffered as a result of the Reserve's conduct;

h.   Order the Reserve to account for and pay as damages to Promontory all profits and advantages gained from the Reserve's false and misleading assertions regarding Promontory's IND service;

i.   Award Promontory punitive damages in an amount to be proved at trial;

j.   Award Promontory equitable relief, including a preliminary and permanent injunction against the Reserve Parties from (a) enforcing or attempting to enforce the '231 patent and the '286 patent against Promontory's customers and service providers, and (b) making false or misleading assertions regarding the IND service or Promontory to actual or prospective customers or service providers of Promontory;

k.   Find this case "exceptional" within the meaning of 35 U.S.C. § 285 and award Promontory all reasonable attorneys fees, expenses, and costs;

l.   Award Promontory such reasonable attorney fees, interest, and costs pursuant to the Lanham Act and as otherwise provided by law; and

m.   Award such other relief as this Court deems just and proper.

Dated: March 24, 2009

Respectfully submitted,

*Andrew Nicely    by Luke Lev*

Robert D. Gilbert, Esq.
rgilbert@mayerbrowm.com
Mayer Brown LLP
1675 Broadway
New York, New York 10019-5820
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

Andrew Nicely, Esq. (Va. Bar No. 72773)
anicely@mayerbrown.com
Luke Levasseur, Esq. (Va. Bar No. 35384)
llevassuer@mayerbrown.com
Mayer Brown LLP
1909 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

Counsel for Plaintiff
PROMONTORY INTERFINANCIAL NETWORK, LLC